UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
DR. LISA BUON,

               Plaintiff,                               19 CV 6760 (NSR)

vs.

NEWBURGH ENLARGED CITY SCHOOL DISTRICT,   **FIRST AMENDED**
ROBERT PADILLA, DR. LISA M. SPINDLER,       **COMPLAINT**

               Defendants.
-------------------------------------------------------------------x

By and through her counsel, Michael H. Sussman, plaintiff Lisa Buon complains of defendants as follows:

## I. PARTIES

1. Plaintiff, Dr. Lisa Buon, is an African American woman of West Indian descent. She is of legal age and resides in the Town of Hamptonburgh, County of Orange, State of New York within this judicial district.

2. Defendant Newburgh Enlarged City School District [NECSD] is a municipal corporation situated in the County of Orange, State of New York within this judicial district. It may sue and be sued.

3. At all relevant times, defendant Robert Padilla served as the Superintendent of Schools employed by the NECSD within this judicial district. His acts and omissions were undertaken under color of state law. Mr. Padilla is not African American nor of West Indian descent.

4. During the 2018-19 school year, defendant Lisamarie Spindler served as Assistant Superintendent, Secondary Curriculum and Education for the NECSD within this judicial district. Her acts and omissions were undertaken

Case 7:19-cv-06760-NSR Document 27 Filed 03/30/20 Page 2 of 14

under color of state law.  Defendant Spindler is not African American nor of West Indian descent.

## II. **STATEMENT OF FACTS**

5.  Before the 2017-18 school year and for the preceding 12 years, plaintiff served as an elementary school principal at Horizons-on-Hudson, a successful magnet school operated by the NECSD.

6.  During plaintiff's employment in that capacity, defendant Padilla was appointed as Superintendent of Schools.

7.  During the spring 2017, defendant Padilla approached plaintiff and asked whether she would be willing to assume leadership of South Middle School [hereinafter "SMS"], a troubled school building.

8.  Plaintiff expressed concern that, in doing so, she would lose the tenure she had earned as an elementary school principal.

9.  Defendant Padilla and plaintiff then negotiated the terms of an agreement allowing plaintiff to retain her tenure as an elementary school principal after she became principal of SMS and during her four-year period of probation as a secondary school principal.

10.  On June 21, 2017, the NECSD's Board of Education approved a resolution which appointed plaintiff as Middle School Principal for a four year probationary term "subject to the Principal's receipt of overall APPR ratings pursuant to Education Law Section 3012-d of either Effective or Highly Effective in at least three of the four years preceding tenure conferral..."

Case 7:19-cv-06760-NSR Document 27 Filed 03/30/20 Page 3 of 14

11. Upon commencing service as middle school principal, plaintiff was to receive annual salary of $154,797.

12. During the 2017-18 school year, plaintiff successfully served as principal of SMS, coordinated the RISE program and was assigned to work summer school (as she had been assigned for the five prior years).

13. During the 2017-18 school year, plaintiff's supervisors did not call her into disciplinary meetings or otherwise raise issue with the manner in which she administered SMS or discharged duties associated with the other assignments noted in paragraph 13.

14. In the summer 2018, defendant Spindler was appointed to a newly created administrative position and became plaintiff's immediate supervisor.

15. During the 2018-19 school year, defendant Spindler and Padilla consistently criticized plaintiff and invited her to numerous disciplinary meetings and meted out unjustified chastisement.

16. During the 2018-19 school year, defendant Spindler did not subject secondary school administrators of a different race and/or national origin to plaintiff of the same harsh treatment.

17. More specifically, during the 2017-18 school year, Buon successfully implemented the "My Brothers Keeper" program at SMS.

18. However, while other secondary school principals were permitted to craft Empire Programs to meet the needs of their buildings, defendant Spindler denied Buon authority and support needed to continue this program at SMS.

19.  Likewise, while defendant Padilla supported the request from white principal Rob Glowacki to bar a disruptive parent from his schools, plaintiff's like request was ignored and a violent parent permitted ongoing access to SMS.

20.  In late October 2018, defendant Spindler directed plaintiff to advise SMS students that they were not allowed to dress for Halloween.  In her memo, defendant Spindler claimed that she had similarly directed other school principals.

21.  But, in fact, she had not told any other middle school principal to make robo-calls to students with this message and students at the other three schools, none of whom had an African-American or West-Indian principal, wore costumes to school on Wednesday, October 31, 2018

22.  Further, typically, when central office administrators conduct "walk throughs" of schools, they request that the school principal accompany them.

23.  Defendant Spindler followed the same protocol except when conducting a school walk-though of SMS on November 2, 2018.

24.  Instead, defendant Spindler excluded plaintiff from the walk though.

25.  After the walk-through, Spindler gave plaintiff a list of nineteen items which needed correction -  many of these items had innocent explanations and were not evidence of school-based dysfunction, as defendant Spindler portrayed.

26.  Defendant Spindler did not treat other secondary school principals who were not African American or of West Indian descent in a similar manner when she performed collaborative walk throughs of their buildings.

27. Further, each middle school convened school leadership teams [SLT] to determine the math program most beneficial to its students. As there was no singular math curriculum, each district middle school was doing something different when it came to math education.

28. In November 2018, SMS' SLT recommended "Math in the City".

29. However, again unlike her treatment of SLTs in schools led by principals who were not African-American or of West Indian descent, defendant Spindler chastised plaintiff for this choice, inaccurately claiming that "Math in the City" was not a math program which could be implemented at a middle school (outside of New York City).

30. Contravening the SLT's recommendation, defendant Spindler directed plaintiff's staff to attend staff development in another math program, a course of action contrary to that used when Lynette Brunger, a white principal , chose a program different from that defendant Spindler favored.

31. In the latter case, Spindler stood down, cancelled the mandatory math training for all 6th grade teachers and allowed that school to implement its chosen math. Prior to Brunger's intervention, Dr. Buon was not supported in doing the same.

32. In November 2018, defendant Spindler advised plaintiff that she was supposed to be meeting with her monthly as part of Academic Cabinet.

33. By then, outside of disciplinary meetings, defendant Spindler had conducted no such meeting with plaintiff, though she had done so with other principals who were not African American or West Indian.

34.  Indeed, by late November 2018, defendant Spindler has never had a one-on-one "academic cabinet" meeting with plaintiff.

35.  On November 30, 2018, a senior administrator provided plaintiff with a critical letter of evaluation which contained false accusations.

36.  Plaintiff responded to this letter, explaining why the claims advanced against her were inaccurate and manifested disparate treatment.

37.  On December 2, 2018, plaintiff filed an internal complaint alleging that defendant Spindler had discriminatorily created a hostile work environment.

38.  In January 2019, plaintiff learned that she and defendant Spindler were supposed to make a presentation at an academic cabinet meeting.

39.  However, defendant Spindler provided plaintiff late notice of this alleged collaboration, making its implementation impossible.

40.  Later, defendant Padilla had Dr. Spindler share the district protocol for such collaboration with plaintiff in front of the Academic Cabinet team, thereby humiliating her and making it appear that plaintiff was unprepared to discharge her duties; in fact, defendant Spindler had never timely shared the protocol with plaintiff.

41.  The NECSD used calendar invites to notify principals of meetings.

42.  Unless otherwise noted, such invites did not mandate attendance at the referenced meeting.

43.  Other secondary school principals did not timely respond to such invites or attend the referenced meeting.

44. These principals were not African American or West Indian.

45. However, contrary to the treatment he accorded her similarly situated peers, defendant Padilla specifically instructed plaintiff to respond to such invites within 24 hours of receipt and required her alone to explain why could not attend any meeting.

46. On January 9, 2019, the district's Assistant Superintendent of Human Resources required plaintiff's attendance at a disciplinary meeting to discuss false claims that she had abused sick leave.

47. In fact, unlike a white principal, Glowacki who was permitted to use vacation days to attend a family wedding upon his verbal request, the district required plaintiff to provide written proof of the wedding before considering her request for vacation days.

48. In January 2019, the staff member in charge of the RISE program had to leave the district, creating a vacancy for an administrator in charge of the program.

49. The salary was the contractual rate of $81.00 an hour for 2.5 to 3 hours, five days a week or approximately $30,000.

50. As she had previously successfully held this position, plaintiff applied.

51. Plaintiff fully qualified for this position.

52. However, at defendant Padilla's recommendation, the district gave the position to a newly hired central office administrator who did not hold a school-based job and was neither African American nor West Indian.

53.  This candidate was less qualified than plaintiff for the position of RISE administrator and in recommending and appointing her, defendant Padilla and the district intentionally discriminated against plaintiff on the basis of her race and national origin.

54.  In February 2019, defendant Spindler cancelled the Course Recovery Program, which served academically needy students.

55.  However, while she advised one principal, Lopez, who is not African-American or West Indian of the cancellation of the program, defendant Spindler did not advise plaintiff of this action and tried to blame plaintiff for not timely knowing the program had been cancelled.

56.  In February 2019, defendant Padilla claimed that plaintiff was coming to school late, meaning between 6:58 am–7:10 am.

57.  And, in later removing plaintiff from SMH and reverting her to an elementary school building at a lower salary, Padilla adduced tardiness as one of his grounds.

58.  However, in so acting, defendant Padilla ignored the facts that the contract with the administrators' union did not contain a specific start-time and numerous other similarly situated secondary school administrators reported to school later than plaintiff with no adverse consequences.

59.  Again, through defendant Padilla, defendant district subjected plaintiff to disparate treatment when compared with similarly situated school administrators who were not African American or of West Indian descent.

60. On February 15, 2019, plaintiff could not attend a meeting to which she had been invited. Plaintiff so responded within 24 hours of receipt of the invite.

61. However, defendant Spindler berated plaintiff for not attending the meeting, while two other administrators, neither of whom was African-American nor of West Indian descent, failed to respond to the invite at all and did not attend the meeting with no consequence or follow-up by defendant Spindler.

62. In mid-March 2019, defendants Padilla and Spindler and members of the NECSD Board of Education hosted a meeting with Newburgh Teacher Association leadership and some teachers from SMS.

63. The meeting was a gripe session about ongoing issues at SMS, issues which preceded plaintiff's arrival and about which she had attempted to exert educational leadership.

64. However, rather than defend plaintiff's leadership, defendants Spindler and Padilla devalued her efforts to turn around this troubled school and scape-goated her as a means of appeasing complaining staff.

65. Later in March 2019, defendant Spindler circumvented plaintiff and attempted to directly question guidance counselor staff about specific students.

66. District protocol and practice counseled that such inquiries go through the building principal, but defendant Spindler ignored these.

67. On March 12, 2019 , Dr. Padilla & Ed Forgit and Carol Mineo, BOE President met with  Stacy Moran, NTA President and heard from a small faction

of teachers disaffected from plaintiff and credited their allegations about school conditions as against the descriptions and explanations provided by Buon, an accomplished and experienced school administrator with substantial faculty and community support.

68. The NTA attorney stated that this meeting was being held to get rid of Dr. Buon. Dr. Padilla's meeting with a small faction of teachers, with a BOE member present, circumvented due process provided by the grievance procedure in plaintiff's contract.

69. In May 2019, though plaintiff had applied for and was better qualified for the positions, defendants Padilla and the district chose much less experienced persons to administrate the district's summer school program.

70. Of the five persons chosen, four were Caucasian, one was Latino, and none were African American or West Indian.

71. The other qualified candidate, Rhode Octobre-Cooper, was of Black, West-Indian Descent.

72. Ms. Octobre-Cooper was passed over for school principal positions and defendants selected white candidates who did not even meet the qualifications for the positions.

73. In this regard, Rob Glowacki, was a white candidate hired as principal instead of Ms. Octobre-Cooper.

74. The job posting required a minimum of five years experience as a building administrator. Mr. Glowacki had no years experience as a building

administrator and was hired over Ms. Octobre-Cooper who has been the assistant principal at SMS for three years and before that as the SS Director.

75. When plaintiff was hired as principal of SMS Dr. Padilla insisted that Ms. Octobre-Cooper remain at SMS based on her expertise and qualifications as a highly effective administrator.

76. On May 22, 2019, defendant Padilla told plaintiff he was recommending her termination as principal of SMS.

77. Defendant Padilla adduced reasons at this meeting and in a letter explaining his decision.

78. These reasons were all pretextual and plaintiff provided a response within five days, on June 10, 2019.

79. For the 2018-19 school year, despite this adverse action, which deprived plaintiff of at least $8,000 in salary/year, plaintiff was rated as an effective administrator.

80. Plaintiff sought to mitigate the loss of her salary by grieving her removal and claiming that it was a transfer which would require maintenance of her salary.

81. Defendant district denied this grievance and the transfer cost plaintiff at least $8,000 in salary.

82. The course of treatment described above caused, and continues to cause, plaintiff substantial public humiliation, embarrassment and emotional distress and anguish.

83. At public meetings, despite strong community support, the defendants maintained their claim that plaintiff had not properly discharged her duties as principal of SMS, necessitating her removal.

84. Such claims were baseless and uttered as part of the discriminatory devaluation of plaintiff's professional contribution and as a cover for the discriminatory treatment accorded plaintiff.

**AS AND FOR A FIRST CAUSE OF ACTION**

85. Plaintiff incorporates paras. 1-84 as if re-stated herein.

86. By discriminating against plaintiff in the terms and conditions of her employment on the basis of her race and national origin, each defendant violated either Title VII of the Civil Rights Act of 1964, as amended, [the school district] or the Equal Protection Clause of the Fourteenth Amendment [Spindler and Padilla] as made actionable by and through 42 U.S.C. section 1983, which prohibits intentionally discriminatory conduct by state actors which, as here, adversely affect the terms and conditions of employment.

**AS AND FOR A SECOND CAUSE OF ACTION**

87. Plaintiff incorporates paras. 1-86 as if re-stated herein.

88. The decisions to deny plaintiff assignment to RISE, summer school administrator status for the summer of 2019 and to remove her from SMS and revert her to elementary school principal status were made by defendants Padilla with input from defendant Spindler as plaintiff's direct supervisor and then ratified and approved by the School Board, which must ratify personnel recommendations made by the Superintendent.

89. By and through each of these decisions, plaintiff was subjected to the loss of salary and income and to public humiliation and embarrassment.

90. In each case, plaintiff was qualified for the position she sought or held and was either denied appointment or replaced by a person of another racial and/or ethnic group who lacked her qualifications.

91. The reasons adduced, if any, for each of these adverse actions is palpably pretextual and false, masking discriminatory intent by the identified decision-makers.

92. Accordingly, in so acting in each of these situations, defendant district violated Title VII of the Civil Rights Act of 1964 and individual defendants Spindler and Padilla violated the Equal Protection Clause of the Fourteenth Amendment, as made actionable by 42 U.S.C. section 1983 by engaging in intentional racial and national origin-based discrimination.

93. As this matter raises federal questions, this Honorable Court has jurisdiction to adjudicate these causes of action pursuant to 28 U.S.C. sections 1331 and 1343 (3) and (4) and 42 U.S.C. secs. 1983 and 1988.

94. Plaintiff timely served an EEOC charge against the defendant district, received a right to sue letter and initiated this matter within 90 days of its receipt.

**WHEREFORE**, this Honorable Court should convene a petit jury to hear and decide all issues within its jurisdiction and purview, should award to plaintiff and against the district compensatory damages for pecuniary and non-pecuniary damages as pled above and, as against defendants Spindler and

Case 7:19-cv-06760-NSR Document 27 Filed 03/30/20 Page 14 of 14

Padilla, should award both compensatory damages for pecuniary and non-pecuniary injuries, as pled above, and punitive damages for the wanton devaluation of her service and reputation as is set forth herein and should award plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. section 1988 and enter any other order which law and/or equity require.

Dated: March 10, 2020

Respectfully submitted,

Michael H. Sussman [3497]

Sussman & Associates
1 Railroad Avenue, 3rd Floor
PO Box 1005
Goshen, NY 10924
(845)-294-3991
sussman1@frontiernet.net

Counsel for Plaintiff Dr. Lisa Buon